**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 20-2184**

_____

In re:  ZETIA (EZETIMIBE) ANTITRUST LITIGATION.

-------------------------------

FWK HOLDINGS, LLC; CESAR CASTILLO, INC., individually and on behalf of all those similarly situated; ROCHESTER DRUG COOPERATIVE, INC.,

          Plaintiffs - Appellees,

     v.

MERCK & COMPANY, INC.; MERCK SHARP & DOHME CORPORATION; SCHERING PLOUGH CORPORATION; SCHERING CORPORATION; MSP SINGAPORE CO. LLC; GLENMARK PHARMACEUTICALS, LTD.; GLENMARK GENERICS INC., USA,

          Defendants - Appellants.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk.  Rebecca Beach Smith, Senior District Judge.  (2:18-md-02836-RBS-DEM)

_____

Argued:  May 6, 2021                         Decided:  August 4, 2021

_____

Before NIEMEYER, FLOYD, and RUSHING, Circuit Judges.

_____

Vacated and remanded by published opinion.  Judge Floyd wrote the opinion, in which Judge Niemeyer and Judge Rushing joined.  Judge Niemeyer wrote a separate concurring opinion.

_____

**ARGUED:** Theodore J. Boutrous, Jr., GIBSON, DUNN & CRUTCHER LLP, Los Angeles, California, for Appellants. Thomas M. Sobol, HAGENS BERMAN SOBOL SHAPIRO LLP, Cambridge, Massachusetts, for Appellee. **ON BRIEF:** Eric J. Stock, New York, New York, Veronica S. Lewis, Ashley Johnson, Dallas, Texas, Samuel J. Liversidge, Christopher D. Dusseault, Bradley J. Hamburger, Daniel R. Adler, GIBSON, DUNN & CRUTCHER LLP, Los Angeles, California; Stephen E. Noona, KAUFMAN & CANOLES, P.C., Norfolk, Virginia, for Appellants Merck & Co., Inc.; Merck Sharp & Dohme Corp.; Schering-Plough Corp.; Schering Corp.; and MSP Singapore Co. LLC. Steven A. Reed, R. Brendan Fee, Zachary M. Johns, Jessica J. Taticchi, Philadelphia, Pennsylvania, Stacey Anne Mahoney, MORGAN, LEWIS & BOCKIUS LLP, New York, New York; Richard H. Ottinger, Dustin M. Paul, Jennifer L. Eaton, VANDEVENTER BLACK LLP, Norfolk, Virginia, for Appellants Glenmark Pharmaceuticals Ltd. and Glenmark Pharmaceuticals Inc., USA. Erin C. Burns, Hannah Schwarzchild, Bradley J. Vettraino, HAGENS BERMAN SOBOL SHAPIRO LLP, Cambridge, Massachusetts, for Appellee FWK Holdings, LLC and the Direct Purchaser Class. William H. Monroe, Jr., Marc C. Greco, Kip A. Harbison, Michael A. Glasser, GLASSER & GLASSER, P.L.C., Norfolk, Virginia, for Appellees FWK Holdings, LLC; César Castillo, Inc.; and Rochester Drug Co-Operative, Inc. John D. Radice, RADICE LAW FIRM, P.C., Princeton, New Jersey; Paul E. Slater, Joseph M. Vanek, David P. Germaine, Alberto Rodriguez, SPERLING & SLATER, P.C., Chicago, Illinois; Michael Roberts, Stephanie Smith, Karen Halbert, Will Wilson, ROBERTS LAW FIRM, P.A., Little Rock, Arkansas; Sharon K. Robertson, Donna M. Evans, COHEN MILSTEIN SELLERS & TOLL PLLC, New York, New York; Steve D. Shadowen, Matthew C. Weiner, HILLIARD & SHADOWEN LLP, Austin, Texas; Joseph H. Meltzer, Terence S. Ziegler, KESSLER TOPAZ MELTZER & CHECK LLP, Radnor, Pennsylvania, for Appellee FWK Holdings, LLC and the Direct Purchaser Class. Linda P. Nussbaum, NUSSBAUM LAW GROUP, P.C., New York, New York; Jayne A. Goldstein, SHEPHERD, FINKELMAN, MILLER & SHAH, LLP, Fort Lauderdale, Florida, for Appellee César Castillo and the Direct Purchaser Class. David F. Sorensen, Ellen T. Noteware, Nicholas Urban, BERGER MONTAGUE PC, Philadelphia, Pennsylvania; Barry Taus, Archana Tamoschunas, Kevin Landau, TAUS, CEBULASH & LANDAU, LLC, New York, New York; Peter R. Kohn, Joseph T. Lukens, Philadelphia, Pennsylvania, Bradley J. Demuth, FARUQI & FARUQI, LLP, New York, New York, for Appellee Rochester Drug Co-Coperative, Inc. and the Direct Purchaser Class.

_____

FLOYD, Circuit Judge:

A group of pharmaceutical buyers brought this class action against two manufacturers who allegedly reached an anticompetitive settlement in a patent dispute. Defendants-Appellants Merck[1] and Glenmark[2] challenge the district court's class certification order. Plaintiffs-Appellees are a class of direct purchasers of Merck's brand-name drug and Glenmark's generic version of that drug. The district court determined that the putative class of thirty-five purchasers satisfied the class certification requirements set forth in Federal Rule of Civil Procedure 23. We hold that the district court's numerosity analysis fell short in several respects, so we vacate the district court's order and remand for further proceedings.

I.

In the 1980s, Merck began developing a cholesterol-lowering drug. Eventually, Merck invented ezetimibe, patented and marketed under the name Zetia. Merck's patent was exclusive through April 2017, meaning that Merck had the exclusive right to develop ezetimibe through that date. In 2006, Glenmark sought FDA approval to market a generic version of Zetia, claiming that Merck's Zetia patent was "invalid or w[ould] not be infringed by the manufacture, use, or sale of" Glenmark's generic. *See* 21 U.S.C.

---

[1] "Merck" refers to Defendants-Appellants Merck & Co., Inc.; Merck Sharp & Dohme Corp.; Schering-Plough Corp.; Schering Corp.; and MSP Singapore Co. LLC.

[2] "Glenmark" refers to Defendants-Appellants Glenmark Pharmaceuticals Ltd. and Glenmark Pharmaceuticals Inc., USA.

§ 355(j)(2)(A)(vii)(IV).[3] As required by law, Glenmark notified Merck of its generic drug application. Merck promptly sued Glenmark for patent infringement. Glenmark did not contest that its proposed generic infringed on Merck's patent. Instead, Glenmark argued that Merck's patent was invalid. In 2010, Merck and Glenmark settled the patent dispute. The settlement agreement allowed Glenmark to launch its generic in December 2016—over four months before the expiration of Merck's exclusivity period.

Plaintiffs, on behalf of a small group of drug wholesalers that purchased Zetia directly from Merck, sued Merck and Glenmark under federal antitrust law, alleging that the two companies conspired to inflate the drug's price. Plaintiffs' case drew parallels to the Supreme Court's decision in *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013), which concerned the anticompetitive settlement of a patent case. In *Actavis*, a brand-name manufacturer sued generic manufacturers for patent infringement. Under the parties' settlement agreement, the brand-name manufacturer agreed to a reverse payment in which it agreed to pay the generic manufacturers between $240 and $342 million to delay the launch of their generic products. *Id.* at 144–45. The FTC then sued both parties, alleging that the reverse payment was anticompetitive and therefore in violation of federal antitrust law. *Id.* at 145. The Supreme Court agreed, holding that a "large and unjustified" reverse payment made "in return for staying out of the market" may give rise to antitrust liability. *Id.* at 154, 158.

---

[3] Federal law gives competing drug manufacturers the opportunity to introduce generic versions of branded drugs. Generic manufacturers may obtain FDA approval through an abbreviated review process so long as the generic is a bioequivalent of the approved, brand-name drug.

In this case, Plaintiffs allege that Merck made a "reverse payment" by giving up its right to sell a generic version of ezetimibe for the six-month period after Glenmark introduced its own generic. Because Glenmark was the first to seek FDA approval for a generic ezetimibe, it had the near-exclusive right to sell a generic for 180 days after launching it. 21 U.S.C. § 355(j)(5)(B)(iv). The right is near-exclusive because the brand-name manufacturer can market a competing generic, called an "authorized generic," by essentially rebranding its brand-name drug and selling it at a lower price point. *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 189 (3d Cir. 2020).

Here, Merck chose to discount its branded drug rather than launch an authorized generic. Based on that decision, Plaintiffs allege that Merck must have agreed not to launch any authorized generic in exchange for ending the patent litigation between Merck and Glenmark. According to Plaintiffs, this agreement constitutes an anticompetitive "reverse payment." Without such an agreement, Merck and Glenmark would have settled the case by allowing Glenmark to launch its generic at least two years earlier than it actually did in December 2016. Had Glenmark's less expensive generic been available for those two years, the class would have spent billions less acquiring the generic ezetimibe instead of Merck's brand-name version.

Three entities sought to represent a class of all direct Zetia purchasers: FWK Holdings, LLC (FWK), Rochester Drug Co-Operative, Inc. (Rochester), and César Castillo, Inc. (Castillo). The thirty-two absent class members are all sophisticated companies with purportedly large claims, including the "Big Three" wholesalers—

5

McKesson, AmerisourceBergen, and Cardinal Health—"who account for 97 percent of all class purchases." J.A. 1088.

Plaintiffs moved for class certification in November 2019. Merck and Glenmark opposed the motion, contending that the proposed class did not satisfy the requirements of Federal Rule of Civil Procedure 23. A magistrate judge issued a report and recommendation to certify the class in June 2020, to which Merck and Glenmark objected. In August 2020, the district court adopted the report, overruled all objections, and certified the class. Merck and Glenmark timely appealed.

## II.

"We review a district court's decision to certify a class for abuse of discretion." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014). But "[a] district court per se abuses its discretion when it makes an error of law." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006).

## III.

Before any class may be certified, Rule 23(a) requires a district court to make the following determinations:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

6

Fed. R. Civ. P. 23(a). "A party seeking class certification must affirmatively demonstrate his compliance with the Rule," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011), and must do so with "evidentiary proof," *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). And classes certified under Rule 23(b)(3)—as is the case here—are only appropriate when (1) "all of the prerequisites of Rule 23(a) are satisfied," (2) "common questions of law or fact . . . predominate over any questions affecting only individual class members," and (3) "proceeding as a class [is] superior to other available methods of litigation." *EQT Prod.*, 764 F.3d at 357. Merck and Glenmark argue that the district court's decision to certify the class ran afoul of several of these requirements. We consider each in turn.

A.

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Though "[n]o specified number is needed to maintain a class action," *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 374 F.2d 648, 653 (4th Cir. 1967), "[a]s a general guideline, . . . a class that encompasses fewer than 20 members will likely not be certified . . . while a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone," 1 *Newberg on Class Actions* § 3:12 (5th ed. 2021). For the "gray area" cases between twenty and forty members, J.A. 1916 (quoting J.A. 1081), "all the circumstances of the case should be taken into consideration" in evaluating the impracticability of joinder, *Ballard v. Shield of S.W. Va., Inc.*, 543 F.2d 1075, 1080 (4th Cir. 1976).

7

The district court conducted its numerosity analysis using the Third Circuit's "non-exhaustive list" of factors, which includes "judicial economy, the claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of class members, [and] the geographic dispersion of class members." *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 253 (3d Cir. 2016) (vacating class certification in a reverse-payment case under Rule 23(a)'s numerosity requirement). The district court determined that the judicial-economy and geographic-dispersion factors favored class certification, though the latter "should be given relatively lower weight than the other factors." J.A. 1921. The court also explained that the "financial factor does not significantly inform the practicability assessment." J.A. 1922 (quoting J.A. 1090 (cleaned up)). Finally, the court concluded that the "ability and motivations of the class members to proceed via joinder weigh 'slightly' in favor of a finding that joinder is impracticable." J.A. 1920 (quoting J.A. 1086).

We commend the magistrate judge and district court for their careful and thorough adjudication of the class certification motion. But for the reasons explained below, we are compelled to conclude that the court rested its numerosity analysis on faulty logic.

For starters, the district court appears to have based its numerosity determination on its reasoning that "multiple *individual* trials" would result if the case proceeded without class status. *See* J.A. 1085 (emphasis added). But "the text of Rule 23(a)(1) refers to whether 'the class is so numerous that *joinder* of all members is impracticable,' not whether the class is so numerous that failing to certify presents the risk of many separate lawsuits." *Modafinil*, 837 F.3d at 253. The district court's numerosity analysis ran afoul of this important principle in two critical ways.

8

First, in the course of analyzing the judicial-economy factor, the district court adopted the magistrate judge's reasoning that "multiple individual trials . . . will essentially involve the same theories of liability and largely the same evidence," and that "[i]n such circumstances, proceeding in a class action is preferred as it greatly conserves judicial resources." J.A. 1085; *see* J.A. 1919 ("agree[ing] with the analysis in the [report and recommendation] on the judicial economy factor"). True, the district court minimized this aspect of the magistrate judge's analysis, noting that the magistrate judge "spen[t] just a single paragraph on the possibility that there could be some separate trials." J.A. 1918–19. But given the district court's conclusion that "judicial economy is the most persuasive of the numerosity factors," J.A. 1922, we are left in the dark as to whether this faulty logic played into the district court's numerosity analysis.[4]

When analyzing the judicial-economy factor on remand, the district court should consider whether judicial economy favors *either* a class action *or* joinder. *See Modafinil*, 837 F.3d at 254 (noting that the judicial-economy factor involves weighing "'the actual, practical difficulties of joining all of the potential class members' by inquiring whether *joinder* 'would be expensive, time-consuming, and logistically unfeasible'" (emphasis added) (quoting 5 *Moore's Federal Practice* § 23.22)). Otherwise, the judicial-economy

---

[4] In a footnote, the district court suggested our precedent permits it to compare the practicability of a class to that of individual trials, noting that "the Third Circuit's statements in *Modafinil* are contrary to those of other courts, including the Fourth Circuit." J.A. 1919 n.9. We disagree. The district court's conclusion relied on *Ballard*, which observed in passing that individual suits could increase the volume of discovery. *See* 543 F.2d at 1080. This comment, which is dicta, directly conflicts with the language of Rule 23(a)(1). We therefore afford it no weight and do not consider it binding precedent.

factor would always favor class certification, which is simpler to manage than individual lawsuits. In fact, even compared to *joinder*, class certification will often be preferable from a judicial economy perspective.[5]

Second, in analyzing the class members' ability and motivation to litigate, the district court again focused its analysis on the economics of individual suits. *See* J.A. 1920 (agreeing with the magistrate judge that the motivation factor favored certification, in part, given "*evidence from other cases regarding class members' motivation to pursue claims on their own*" (emphasis added)).[6] In considering the feasibility of pursing individual claims, the magistrate judge and district court seem to acknowledge yet adopt Plaintiffs' "assum[ption], without any evidence, that absent a class action, the[ ] smaller claimants would sue individually and thus bear the entire cost of litigation." J.A. 1089. This misconstrues the standard. Indeed, "there has been no showing that it would be

---

[5] And in analyzing this factor, district courts should bear in mind Rule 23(a)'s high standard, which asks whether a variety of factors make joinder not only uneconomical but also economically *impracticable*. Fed. R. Civ. P. 23(a)(1).

[6] The district court made this finding despite noting that Plaintiffs "offered little case-specific and member-specific evidence that class members would not join the suit on their own." J.A. 1920. But Rule 23 places on Plaintiffs the burden of "present[ing] evidence that the putative class complies with Rule 23." *See EQT Prod.*, 764 F.3d at 357. And in presenting this evidence, Plaintiffs must do more than simply show that litigating as a class—rather than joinder—would offer marginal economic benefits. True, "[i]mpracticable does not mean impossible." *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993). But the impracticability standard recognizes that "[t]he class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores*, 564 U.S. at 348 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). We see little evidence in the record to support this point, and we expect that the district court will require Plaintiffs to adduce such evidence on remand to establish impracticability.

uneconomical for [smaller claimants] to be individually joined as parties in a traditional lawsuit." *Modafinil*, 837 F.3d at 259. Plaintiffs must bring to bear some evidence to this effect—and the district court may not consider the economics of individual suits in analyzing this factor.[7]

To be sure, we give "district courts considerable discretion in making numerosity determinations." *Id.* at 249. But district courts must provide a "rigorous analysis" to allow for meaningful appellate review on the numerosity factor. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). And that "rigorous analysis" must be premised on a correct understanding of Rule 23(a)(1). Because the district court's numerosity analysis improperly looked to the impracticability of individual suits rather than joinder, we are compelled to conclude that legal error infected the court's class-certification decision. *See Modafinil*, 837 F.3d at 249 ("A district court abuses [its] discretion . . . when it considers issues that have no place in the numerosity requirement."). We therefore vacate the district court's class-certification order.

---

[7] Notably underscoring the district court's analysis of this factor is the assumption that if even one party may be *unmotivated* to litigate their small-value claims, Rule 23(a)(1) is satisfied because joinder of "*all members*" would then be impracticable. *See* Fed. R. Civ. P. 23(a)(1) (emphasis added). But—as the Third Circuit stated in *Modafinil*—some parties being economically *unmotivated* to litigate via joinder is only one of many factors to consider in making an impracticability of joinder consideration. 837 F.3d at 259 ("Even if it were uneconomical for some . . . of the[ ] individual plaintiffs to join the suit, the District Court must still determine whether, considering all the other relevant factors, class status . . . is appropriate here.").

B.

Merck and Glenmark raise two additional arguments related to class certification, which we can quickly resolve.

1.

First, Merck and Glenmark challenge the district court's adequacy determination, arguing that none of the named plaintiffs can adequately represent the class. We see no abuse of discretion here. We recognize that class counsel "is largely responsible for [named plaintiff] FWK's formation." J.A. 1103. But the district court found "no evidence in this case that either FWK or [its owner] have any current or prospective financial dealings with any of class counsel." J.A. 1106, 1925. The court did not abuse its discretion in finding that "the record in this case satisfactorily demonstrates FWK's adequacy to serve as class representative." J.A. 1105, 1925.

We also find no abuse of discretion in the decision that named plaintiff Rochester, despite its current Chapter 11 bankruptcy proceedings, still "share[s] common objectives and the same factual and legal positions" as other class members. *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010) (quoting *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430–31 (4th Cir. 2003)). Indeed, Rochester's bankruptcy status gives it a "strong interest" in recovering its "fairly substantial" $40.5 million in treble damages. J.A. 1122. The fact that Merck and Glenmark are two of Rochester's creditors does not change that interest.

12

Merck and Glenmark further argue that named plaintiff Castillo "lacks standing under Article III and the antitrust laws—which renders it an atypical class representative" because Castillo "could not have been injured by the claimed delay in the availability of a product it would not have bought anyway." Opening Br. at 47. But Merck's and Glenmark's argument as to Castillo is an injury question for the jury—not a question of standing. *See In re Deepwater Horizon*, 739 F.3d 790, 803 (5th Cir. 2014) (noting that to establish "Article III standing of named plaintiffs during class certification under Rule 23, . . . it [is] 'sufficient for standing purposes that the plaintiffs seek recovery for an economic harm that they allege they have suffered'" (quoting *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007))). Moreover, contesting a class representative's injury does not defeat typicality—another argument made by Merck and Glenmark. *Beck v. Maximus, Inc.*, 457 F.3d 291, 300 (3d Cir. 2006) ("To defeat class certification, a defendant must show some degree of likelihood a unique defense will play a significant role at trial."). Because Castillo will rely on the same common evidence as the class to prove its injury at trial, we see no abuse of discretion in the district court's adequacy finding as to Castillo.

Accordingly, we reject Merck's and Glenmark's contention that the district court abused its discretion in finding the named plaintiffs adequate class representatives.

2.

Second, Merck and Glenmark challenge the district court's predominance determination. "Rule 23(b)(3) requires a showing that *questions* common to the class predominate . . . ." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013).

13

Predominance also applies to damages "because the efficiencies of the class action mechanism would be negated if '[q]uestions of individual damage calculations . . . overwhelm questions common to the class.'" *Modafinil*, 837 F.3d at 260 (alterations in original) (quoting *Comcast*, 569 U.S. at 34). "This does not mean, however, that damages must be 'susceptible of measurement across the entire class for purposes of Rule 23(b)(3).'" *Id.* (quoting *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374 (3d Cir. 2015)).

Merck and Glenmark argue that the district court erred in permitting Plaintiffs to use industry- and class-wide averages to prove injury for the purposes of Article III and antitrust standing. They contend that this method of proof swallows the predominance requirement. According to Merck and Glenmark, Plaintiffs predict their "averages-based approach will show that *most* class members suffered injury, but leave open the possibility that fact-specific inquiries may be necessary to prove that others are injured." Reply Br. at 21. The district court rejected these arguments, concluding that different forms of common proof could show antitrust injury to the class. The court explained that a reasonable jury could find that all class members would have purchased some generic form of the drug—rather than the more expensive brand—had a generic been available earlier. We agree.

In addition to establishing Article III standing, private antitrust plaintiffs "must also demonstrate 'antitrust standing.'" *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 310 (4th Cir. 2007). Antitrust standing "often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may

call for individual, as opposed to common, proof." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311–12 (3d Cir. 2008). But we find no issue with the practice of proving injury by class-wide averages, which the district court correctly characterized as "common." J.A. 1927. Moreover, even if some individualized-injury inquiry is ultimately required at trial for some defendants, common issues will still predominate. We therefore affirm the district court's predominance finding.

C.

Plaintiffs invite us to review the district court's dismissal of twenty-three companies.[8] But Plaintiffs never filed a cross-petition raising the issue. And "[t]he failure to file [a] petition for permission to cross-appeal . . . is a jurisdictional defect, barring" consideration of any issue that may have been raised. *Tranello v. Frey*, 962 F.2d 244, 248 (2d Cir. 1992) (citing *Myles v. Laffitte*, 881 F.2d 125, 126 (4th Cir. 1989)).

Accordingly, Plaintiffs waived any objection to the district court's dismissal of these companies. In the magistrate judge's recommendation that the district court certify the thirty-five-member class, the magistrate judge advised the parties "that failure to file timely

---

[8] Generally, "only direct purchasers from an antitrust violator can sue for damages." *Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002). When Glenmark began making the generic drug in December 2016, it sold the generic to its exclusive dealer Par at cost-plus-shipping. Plaintiffs allege that Par is therefore a co-conspirator, so the district court erred in dismissing the claims of the twenty-three companies who purchased generic ezetimibe from Par rather than from Glenmark. *See Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019) (noting that "immediate buyers from the alleged antitrust violators" can be construed as direct purchasers under the Clayton Act (cleaned up)). *But see Ill. Brick Co. v. Illinois*, 431 U.S. 720, 730–33 (1977) (prohibiting an indirect purchaser from suing for overcharges passed on to it from an upstream dealer).

objections" would "result in waiver of appeal from a judgment of this Court based on such findings and recommendations." J.A. 1142–43. Plaintiffs did not appeal the thirty-five-member class or argue the class should be a fifty-eight-person class that included the twenty-three dismissed companies. Failure to do so constitutes waiver.

Resisting this conclusion, Plaintiffs ask us to consider their waived challenge under our "pendant appellate jurisdiction." Resp. Br. at 46 (citing *Scott v. Fam. Dollar Stores, Inc.*, 733 F.3d 105, 110-11 (4th Cir. 2013)). In *Scott*, we exercised pendant appellate jurisdiction in a Rule 23(f) appeal where the district court had previously denied leave to amend a complaint, but petitioners had failed to seek interlocutory review of the order denying the motion for leave to amend the complaint. 733 F.3d at 110–11. We concluded that reviewing the leave-to-amend decision was "necessary to ensure meaningful review" and "inextricably intertwined" with an issue on appeal. *Id.* at 111 (quoting *Rux v. Republic of Sudan*, 461 F.3d 461, 475 (4th Cir. 2006)). But in *Scott*, the district court declined to certify the class and denied as futile any amendment to the complaint in the same order. And the two questions were intertwined because they turned on the same legal issue.

By contrast, the Rule 12(b)(6) and class certification orders in this case stemmed from separate motions. Moreover, the questions of class certification did not turn on the question presented in the Rule 12(b)(6) order—namely, whether the twenty-three dismissed companies have antitrust standing. Accordingly, we decline Plaintiffs' invitation to exercise pendant appellate jurisdiction. *See EQT Prod.*, 764 F.3d at 364 (declining to exercise pendant jurisdiction in similar circumstances).

16

IV.

We afford district courts substantial deference in certifying classes. This opinion does not change that deference. Rather, we simply require that the district court consider only those factors permitted by Rule 23(a)'s numerosity requirement and that the court conduct the requisite full-throated analysis. The judgment of the district court is

*VACATED AND REMANDED WITH INSTRUCTIONS.*

NIEMEYER, Circuit Judge, concurring:

I am pleased to join the court's opinion. I write separately only to identify some factors that might be considered in determining "numerosity" under Federal Rule of Civil Procedure 23(a)(1). *See Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 775 (7th Cir. 2021) ("Ample ink has been spilled discussing class action litigation and Federal Rule of Civil Procedure 23. Rare are the cases analyzing the Rule's numerosity requirement").

While a district court's nuanced discretion is especially important in determining whether a proposed class is "so numerous that joinder of all members is *impracticable*," Fed. R. Civ. P. 23(a)(1) (emphasis added), we have recognized that a definitive test has not been articulated to assist in the exercise of that discretion, *see Kelley v. Norfolk & W. Ry. Co.*, 584 F.2d 34, 35 (4th Cir. 1978) (per curiam) (noting that "[t]here is no mechanical test for determining whether in a particular case the requirement of numerosity has been satisfied"). Nonetheless, I believe we can point to a few nonexclusive factors that a district court might consider.

First and perhaps most important is simply the number of members defined to be in the class. Generally, courts have presumed that a class with more than 40 members is sufficiently numerous while a class that numbers 20 or fewer is presumably too small to certify. *See* 5 James Wm. Moore et al., *Moore's Federal Practice* § 23.22[1][b] (3d ed. 2020); 1 William B. Rubenstein, *Newberg on Class Actions* § 3.12 (5th ed. 2021); *see also Kennedy v. Va. Polytechnic Inst. & State Univ.*, No. 7-08-CV-00579, 2010 WL 3743642, at *3 (W.D. Va. Sept. 23, 2010) ("A nationwide survey of federal court decisions signals that it is exceedingly rare to certify classes with less than 25 members. . . . [C]ourts seem

18

much more willing to certify a class if it has more than 40 members" (citations omitted)). For me, a class fewer than even 30 members should be exceptional.

But other factors must be considered to give flesh to the numbers inquiry. Leading treatises have typically summarized the relevant factors as (1) judicial economy resulting from avoidance of joined or independent actions, (2) geographic dispersion of putative class members, and (3) the ability and motivation of class members to bring suit absent class certification. *See* Moore's, *supra*, § 23.22[1][a]; Rubenstein, *supra*, §§ 3.11, 3.12; *cf. In re Modafinil Antitrust Litig.*, 837 F.3d 238, 253 (3d Cir. 2016). The weight to be given any relevant factor, however, will be influenced by the particular facts of the case. For example, geographic dispersion, or the lack thereof, may have extra importance when a putative class's members are either especially scattered or notably concentrated. *See, e.g., Anderson*, 986 F.3d at 777 (noting that geographic dispersion cut against certification where "[a]ll but two of the class members lived within a 50-mile radius of the courthouse"). And class members' motivation gains importance where there is reason to believe that those members would otherwise refrain from a joint suit out of "fear of possible reprisals" by the defendant or for other reasons cutting both for and against certification. *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967) (en banc) (certifying a small class of Black physicians in an employment discrimination suit).

Judicial economy as a broad category appears to be the factor on which courts have relied most heavily. *See Modafinil*, 837 F.3d at 253–54 (stating that "both judicial economy and the ability to litigate as joined parties are of primary importance"); *see also McKenna v. First Horizon Home Loan Corp.*, 475 F.3d 418, 427 (1st Cir. 2007) ("Among

the primary rationales behind the class action mechanism are judicial economy and efficiency"). One aspect of judicial economy is docket management. *See Modafinil*, 837 F.3d at 257 ("[Judicial economy] primarily involves considerations of docket control, taking into account practicalities as simple as that of every attorney making an appearance on the record"). All members of a putative class suing on their own — even if joined under Rule 20 — will naturally place a greater strain on a district court than having just two or three class members represent the whole. *See Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993); *see also* Rubenstein, *supra*, § 3.11 ("Where many individuals have similar claims, there may be a flood of litigation. With so many litigants proceeding individually, the courts would be overrun with claims. Yet the vast quantity of individual litigants makes joinder impracticable").

Another facet of judicial economy is courtroom space and correlated staffing. For example, more parties joined to an action means, in most cases, more attorneys, each of which must be present in court for hearings and conferences. In this case, there may be a substantial gap between the number of attorneys currently needed to represent the 3 named class representatives and the number that would be needed to represent 35 joined parties, if that many were to consent, even if one assumes that each joined party has only 2 or 3 attorneys present. A court could reasonably recognize the demands on physical space and staffing necessary to accommodate so many individuals. *See Town of New Castle v. Yonkers Contracting Co.*, 131 F.R.D. 38, 41 (S.D.N.Y. 1990) ("[T]he impracticability of joinder is best seen by noting the difficulties involved in having thirty-five intervenors, all

with their respective attorneys, attempt to go through the formal motions required for entrance into and participation in the suit" (cleaned up)).

As a further aspect of judicial economy, a district court may consider the differential in costs of discovery between a class action and an action with many joined parties. The court could consider whether, in the action of joined parties, "discovery would be repetitive and unduly expensive." *Ballard v. Blue Shield of S.W. Va., Inc.*, 543 F.2d 1075, 1080 (4th Cir. 1976). But while a district court may give weight to this consideration as to *future discovery*, it should not succumb to the sunk-cost fallacy and certify a class merely because a great deal of effort has *already been expended* in discovery. Noteworthy about discovery is the fact that it represents civil litigation's largest cost. *See generally* John S. Beckerman, *Confronting Civil Discovery's Fatal Flaws*, 84 Minn. L. Rev. 505 (2000); Nicholas M. Pace & Laura Zakaras, RAND Inst. for Civ. Just., *Where the Money Goes: Understanding Litigant Expenditures for Producing Electronic Discovery* (2012).

And an aspect of broader practicality, and also, perhaps, judicial economy, might relate to the ability to identify class members. *See Baltimore v. Laborers' Int'l Union of N. Am.*, 67 F.3d 293, at *1 (4th Cir. 1995) (unpublished table decision); *Ballard*, 543 F.2d at 1080 (noting that "the number of [class members] and knowledge of their identity . . . should be considered"). It has been observed that if a "majority of the members of the proposed class were identified" by the court, and especially if those members "reside within an established jurisdictional boundary," joinder may be more practicable. *Baltimore*, 67 F.3d at *1. On the other hand, when absent class members "are not

21

specifically identifiable," joinder might become more impracticable. *Doe v. Charleston Area Med. Ctr., Inc.*, 529 F.2d 638, 645 (4th Cir. 1975).

These factors are, to be sure, not exhaustive. But they exemplify the nature of what should be considered in determining the numerosity requirement of Rule 23(a)(1). At bottom, "*all the circumstances* of the case should be taken into consideration" in a district court's numerosity analysis. *Ballard*, 543 F.2d at 1080 (emphasis added). Moreover, an appellate court's review of a certification order should remain mindful that certification is ultimately determined by the district court — not the appellate court — and that it is the district court which will be saddled with the burdens that flow from a decision. *Cf. Brown v. Nucor*, 785 F.3d 895, 922 (4th Cir. 2015) (Agee, J., dissenting) (noting that this court "typically tread[s] lightly when reviewing a class certification decision").